[No. A092105. First Dist., Div. Two. Jan. 23, 2002.]

YONG SHAO MA et al., Plaintiffs and Appellants, v.
CITY AND COUNTY OF SAN FRANCISCO, Defendant and Respondent.

## COUNSEL

Baughman & Wang and David E. Russo for Plaintiffs and Appellants.

Louise H. Renne, City Attorney, Joanne Hoeper, Ellen M. Forman and Cheryl Adams, Deputy City Attorneys, for Defendant and Respondent.

## OPINION

**RUVOLO, J.—**

### I.

### INTRODUCTION

Appellants Yong Shao Ma (Ma) and Pui Kay Chan (Chan) appeal from a summary judgment entered in favor of respondent City and County of San

Francisco (CCSF). Ma and Chan are the surviving husband and father, respectively, of Angelique Chan, who died from an acute asthma attack on the evening of August 27, 1998. Sometime before her death, a call was made to CCSF's 911 medical emergency service, reporting that Ms. Chan was complaining of severe physical distress. In their subsequent civil action for damages, Ma and Chan claimed that CCSF owed a tort duty to callers utilizing its 911 emergency service. They alleged further that this duty was breached both because the 911 dispatcher/call-taker[1] on duty that evening was untrained in the emergency response protocols established by CCSF, and that the dispatcher was negligent in failing to respond to the emergency call in compliance with these protocols.

In its motion for summary judgment, CCSF contended that it owed no tort duty of care to Ms. Chan or, alternatively, that if a duty was owed, the so-called "discretionary immunity" provided at Government Code section 820.2 applied to bar the claim. The trial court agreed with CCSF on both grounds, and entered judgment accordingly.

We reverse, concluding that a duty of care was owed, not with regard to the design or structure of the 911 medical emergency service, but as to the manner in which the 911 emergency service procedures were implemented. We reach this conclusion after examining the circumstances of this case under the traditional multipronged tort duty analysis delineated in *Rowland v. Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496] (*Rowland*).

Having found a duty, we reject the argument that the 911 dispatcher's duty was limited to providing services in a manner not grossly negligent or in bad faith under Health and Safety Code section 1799.107. After examining the legislative history, we conclude the qualified immunity provided by this statute does not extend to 911 dispatchers. Thus, the tort duty owed is that of ordinary due care.

Lastly, we conclude that the discretionary immunity afforded by Government Code section 820.2, while applicable to the design and content of the 911 emergency medical service, does not immunize CCSF from the manner in which that program is administered by 911 dispatchers.

---

[1]CCSF's 911 operator was acting as a combined call-taker and dispatcher on the evening in question. Despite these dual roles, the parties make no attempt to distinguish between the two, nor do we find any material difference to our analysis depending on whether the questioned conduct appears to be more akin to dispatching per se rather than call-taking. Therefore, in order to avoid any confusion in nomenclature, we will refer throughout this opinion to these duties generically as dispatching.

II.

Factual and Procedural Background

A. *CCSF's Criteria-based Dispatch System*

CCSF operates its 911 emergency medical service (EMS) through the department of public health. This department is tasked with overseeing "pre-hospital medical care" for citizens and visitors to San Francisco. Since approximately 1997, the medical director of the EMS department has been Dr. John Brown. Dr. Brown's responsibility as medical director is to administer the policies that govern the day-to-day operations of the EMS, certify emergency medical technicians (EMT's), teach paramedic and EMT courses, and research and develop new or updated policies for the EMS.

Beginning in 1995, CCSF established a task force to investigate different existing standardized EMS dispatching systems to determine which might be most appropriate for use in San Francisco. By the time Dr. Brown joined the department, the task force was looking at two protocols. One was called medical priority dispatching, which was developed in Salt Lake City, and the other was criteria-based dispatching (CBD), which was being used extensively in the State of Washington. Dr. Brown concluded that CBD was best for San Francisco because San Francisco's EMS had combined its fire and paramedic dispatching. This combination brought together dispatchers who were originally trained as firefighters with those who had previous training as paramedics. CBD allows dispatching to be based on a set of uniform criteria rather than based on the answers to a series of questions that had to be asked of each caller, regardless of whether some of the questions were relevant.

By the end of 1997 all of the ambulance providers had signed memoranda of understanding agreeing to use CBD. Implementation of CBD began in early 1998, with a target implementation date of May 1998 for everyone using the new system to be trained in CBD. For the most part, Dr. Brown believed this target was met. Normal training for nonmedically trained personnel was three days long, although those with prior paramedic training went through an eight-hour course. There were a few people who were assigned to the dispatch center just before the CBD implementation date who needed "catch up courses." Dr. Brown was unaware of any introductory training in CBD being given to paramedics in 1998. Departmental policy required that all dispatchers and call-takers receive their full training in CBD, plus continuing education and compliance with quality improvement requirements. Dr. Brown knew of no exceptions to this training prerequisite.

The CBD system included adoption of written CBD guidelines (the guidelines). EMS policy required that, not only would all dispatchers be trained in the system, but also that they would use CBD guidelines or protocols in their dispatching duties. This was true regardless of whether the person was assigned the role of call-taker or dispatcher.

One of the features of CBD is that it standardizes responses based on complaints regardless of the actual cause of the physical symptom. For example, a complaint of shock initiates a standard dispatch response regardless of whether the shock condition is caused by trauma or a bad infection. The "Introduction of Criteria[-]Based Dispatch" publication cautions dispatchers to determine first from callers if any Code 3 criteria are present.[2] The presence of any single Code 3 criterion requires that level of response. This system allows a response to be made immediately based on the patient complaint, and eliminates delay inherent in other dispatching systems, which require answers to a series of questions before a dispatch response is made. Dr. Brown explained that this is the "default" principle and it applies to circumstances where the dispatcher is unsure of the patient's true condition, or if the dispatcher does not have enough information to determine what else might be occurring with the patient. If one criterion is present, the dispatcher is to send a Code 3 response. "[W]hen in doubt, better to send faster than slower."

Of significance to the case before us, the CBD guidelines specifically address how EMS is to respond to 911 complaints of shortness of breath, or inability to breathe. The guidelines have a separate section for various complaints including one for "Breathing Difficulties." Under "Critical factors that should have Code 3 assistance," the guidelines state in part: "Persons who are short of breath or cannot talk in full sentences because of respiratory distress have a significant impairment and should have CODE 3 evaluation." Under "Criteria Definitions," the guidelines provide: "CODE 3 Breathing difficulty: Subjective self-report of uncomfortable breathing pattern. [¶] Short of breath (SOB): Subjective self-report of uncomfortable breathing pattern or patient is unable to speak full sentences and/or has a breathing pattern suggestive of uncomfortable or impaired breathing. [¶] CODE 2 Hurts to breathe: Patient reports pain with deep inspiration and no pain when NOT breathing. No other CODE 3 criteria present." (Original underscoring.)

---

[2]According to CBD guidelines, a "Code 3" response is a "dispatch with lights and sirens." A "Code 2" response is a dispatch without activation of lights and sirens. Perhaps more descriptively, one of the paramedics who responded to the scene of the medical emergency in this case defined Code 3 as "[r]ed lights and siren, pull to the right safely, get out of my way. I am on an emergency. Someone is dying." In contrast, Code 2 was described as meaning, "I go with the traffic flow."

B. *Telephone Call Requesting Emergency Medical Services*[3]

On the evening of August 27, 1998, Ma and his spouse, Ms. Chan, were having dinner and playing cards at a friend's home located on 5th Avenue between Geary Boulevard and California Street in San Francisco. Ms. Chan suffered from asthma and sometimes had difficulty breathing. After dinner that evening, Ms. Chan complained she was not feeling well and was having difficulty breathing. Ma responded by taking her to a nearby Kaiser facility, which had an entrance along Fifth Avenue. The Kaiser facility is referred to as the French Campus. As Ma was apparently unaware, the French Campus does not provide emergency medical services.

As the two entered the building, Ms. Chan was holding her chest and making sounds indicating she was having a hard time breathing. Ma recalls his wife yelling out "help, help" to one of two security guards inside the building. She was unable to continue through the second of two automatic doors into the interior of the facility. Ma then saw one of the guards use the telephone to call someone. His wife continued to have an extremely hard time breathing and her color began to change to a paler, grayish color. Ma then began to yell "help" to the guards. Ma predominantly spoke Cantonese and Mandarin Chinese; he knew only a "little bit" of English.

Shortly thereafter, one of the security guards came over to the couple and asked Ms. Chan to come to the phone. Ma became very upset because his wife was not able to say anything at that point. He then picked up the phone and said "help." He heard a female voice on the line but was unable to understand what was being said. No one tried to translate what the person on the phone was saying.

After returning to his wife, several other people came to their aid, one of whom "applied pressure" on Ms. Chan's chest. This made her feel better and helped her regain consciousness. Mr. Ma told one of the persons who came, a woman in a doctor's-style coat, that his wife had allergies.

One of the security guards, Mr. White, recalled that he first saw Ma and Ms. Chan through the glass sliding doors on the Geary Boulevard side of the facility. Ma was carrying Ms. Chan under her arms with her feet dragging. The two were saying something to each other in Chinese. White turned to his supervisor, Ramiro Salas, and said he would call 911.

---

[3]In setting out the facts in this opinion, we accept as undisputed only those portions of CCSF's evidence that is uncontradicted by appellants. With respect to disputed issues of fact, we accept as true the facts proffered by appellants (the party opposing summary judgment) and the reasonable inferences that can be drawn therefrom. (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1001 [67 Cal.Rptr.2d 483]; *Sada v. Robert F. Kennedy Medical Center* (1997) 56 Cal.App.4th 138, 148 [65 Cal.Rptr.2d 112].)

Upon calling 911, White was immediately connected to the fire rescue dispatcher to whom he reported that a woman had come into the facility at 4131 Geary Boulevard thinking it was an emergency room. The woman then collapsed onto the floor and said she was dying. Asked further about the whereabouts of the woman, White told the dispatcher the woman was still there and was screaming, "I'm dying and I can't breathe." White estimated he was on the telephone with the 911 call-taker for five minutes. After the call, he went out on the 5th Avenue side of the building with a flashlight to await the arrival of police and paramedics.

Mr. Salas recalled that he and White were attracted to the courtyard entry door by screaming. He knew it was a medical emergency once he opened the door and saw the woman gasping for air and repeating, "I can't breathe." He then asked White to call 911. The woman collapsed on the floor and began kicking and screaming in English, "I can't breathe."

Salas assisted White in trying to gather information while White spoke on the telephone with the 911 dispatcher. Once the call ended, Salas went to the 6th Avenue entrance while White manned the 5th Avenue entrance, where they awaited the arrival of the paramedics. The two guards split up so there would be coverage at whichever door the paramedics appeared, and so they could be escorted directly to the patient.

The CCSF 911 dispatcher on duty who received the call from the Kaiser facility was Martha Cody. She had been working as a dispatcher since she returned to light duty in early August 1998 from a work-related injury. Ms. Cody was a paramedic employed by the San Francisco Fire Department. She had worked for the fire department for the past 10 years. Before that, Ms. Cody was employed for three years by the City of Oakland as a paramedic following her graduation from Western Institute in prehospital care in 1987. In her training Cody had learned that an asthma attack can be fatal, and that the victim of such an attack cannot speak words. The symptoms can include shortness of breath, expiratory or inspiratory wheezing, tightness, broncho-spasms, sweating, and sometimes chest pain.

On the night of August 27, 1998, Ms. Cody had a copy of the CBD guidelines sitting at her console. However, during the call from the Kaiser facility, Ms. Cody did not work from the guidelines. At no time during the call did she consult the guidelines, nor was she instructed to follow them. She had never been instructed before that night in the use of CBD guideline questions.

In early 1998, Ms. Cody had taken a four-hour training course in emergency dispatch. However, at this training, she was not provided with the

CBD guidelines, nor was there any discussion of what those criteria were. The program was a general overview of what was coming once the CCSF Department of Public Health and Fire Department emergency medical services merged later that year. She was told that the purpose of implementing the CBD was "so that everyone in the dispatch center would use the same criteria to triage calls." In September 1998, the month after the subject incident, Ms. Cody took a full-day course during which the CBD guidelines were provided to her.

Cody confirmed that a security guard calling from Kaiser's French Campus facility advised her that a woman there was reporting having difficulty breathing. She had no reason to doubt the truthfulness of this statement by the security guard, or that it represented a real emergency. Her training taught her that a complaint of difficulty breathing raises the possibility of a life-threatening situation and that time is of the essence in responding to such calls.

After learning the woman was about 20 years old, Ms. Cody remarked that the woman's comment that she could not breathe was inconsistent with the report that she was screaming. She then asked White to try and put her on the phone. The security guard advised her that the woman was unable to speak on the phone. Another person picked up the telephone and then told Cody that there was a language problem because the woman could speak only Chinese, and the person on the telephone could not communicate with her. When Ms. Cody learned the patient spoke Chinese, she planned to have an interpreter come on the line if the patient responded. The caller was told not to attempt any cardiopulmonary resuscitation (CPR) because one only considers that where there is no pulse.

Based on a chief complaint of shortness of breath, which she was unable to confirm by direct contact with the patient, Ms. Cody understood that her next step was "[t]o try and ascertain exactly what was going on at the scene." In response to screaming heard in the background, Ms. Cody remarked "[i]t sounds like she's flipping out. Like she's got some drugs on board." Asked if the woman had been doing any drugs, White answered in the affirmative, "if [he needed] to venture an opinion . . . ." Ms. Cody then informed White that the police would be called, as would an ambulance. No one mentioned to Ms. Cody that the patient's husband was with her at Kaiser that evening.

In light of White's response, Ms. Cody understood her next step was to ensure that the scene was safe and secure and then to send an ambulance. The screaming she heard, her inability to get a very clear history, and her

inability to talk to the patient all led Ms. Cody to the conclusion that the scene was not secure, although the security guard did not tell Ms. Cody that he felt threatened by the patient. Ms. Cody called the San Francisco police dispatcher immediately after she finished her call with the security guard.

In order to instigate a dispatch response, a call-taker at the EMS communications center inputs information concerning the nature of the call into the computer-assisted dispatch (CAD) system. The communications center CAD report, which appears on the consoles of the workers there, reflects that the 911 call from Kaiser ended at approximately 10:46 p.m. Ms. Cody made an entry of "20 yo female OD bizzare [*sic*] aggressive violent eaming [*sic*] PD to respond."

Sandy Tong was the communications center supervisor that night. She did not know if Ms. Cody had been trained in CBD as of August 27, 1998, as she did not control the people assigned to the center. However, her assumption was that she had been trained, since most of the people had been.

Terrance Hogue worked with Cody and Tong in the communications center on the night of August 27. He was working as the fleet manager. The decision whether to respond to a 911 call with a Code 3 or Code 2 response was usually made by the dispatcher. When Mr. Hogue saw the computer report generated by Cody, who was seated next to him, he asked her what was going on at Kaiser. She told him there was a possible overdose there and that the patient was acting aggressive and violent. Cody was going to respond by sending the police to the scene. Cody told the police that they should call her once the scene at Kaiser had been secured. This was standard operating procedure.

Hogue remembered calling the paramedics a couple of minutes after his exchange with Cody in the center. A paramedic unit was called and told to stand by for a Code 2 response. He did not recall Cody saying that the caller had reported shortness of breath. Had she done so, Hogue would have upgraded the response to a Code 3. Once on the scene, the police officers reported that the patient's condition had worsened, and that she was now having trouble breathing. The dispatch was upgraded to a Code 3 response.

The police first arrived at Kaiser at 10:47 p.m., or 10 minutes after Ma and Ms. Chan arrived there. When Mr. Salas first saw the police officers he believed paramedics were on the way since he and Mr. White had called 911 and described the scene. Salas was annoyed to see that the police responded because they had asked for medical assistance. He estimated that an ambulance arrived 10 minutes after the police got there.

One of the responding police officers was San Francisco Police Officer Jeffrey Brown. When he arrived at the Kaiser French Campus facility, he saw a large group of people gathered in the reception area, where the security guards also were located. One of the security guards and a person in a white lab coat, believed to be a pharmacist, walked to the outside door to meet him. Brown was told that a Chinese couple had come to the facility, banged on the door, and when they came in, the woman began vomiting. 911 was called, and the woman in the white lab coat tried to translate.

Brown walked over to the woman on the floor and noticed that she had just finished vomiting. As soon as he saw her, Officer Brown called for an ambulance Code 2. Right after calling for the ambulance, the officer saw that Ms. Chan had stopped breathing, and he began to administer CPR, along with another police officer on the scene, Officer Madden. Once he learned that the woman had stopped breathing, Officer Brown changed the ambulance summons from Code 2 to Code 3.

San Francisco Police Officer Cathy Schiefer was another of the officers who responded to the Kaiser call that night along with Officer Brown. According to Schiefer, she and Brown responded because the primary officer who received the call was working alone and the call indicated that the incident was possibly PCP-related, and that a city employee needed assistance with a possible resister. When Schiefer arrived, Ms. Chan had a number of other people around her, including the security guards, a person in a white lab coat, and a young Chinese man. Schiefer asked one of the security guards what was going on, noting that the call came into the police department as a possible resister. The security guard replied that he reported a medical emergency and not a resister or that the patient's complaints were PCP-related. Schiefer was puzzled by the fact that the complaint was apparently called in as a medical emergency but the dispatch note to the police came up as it did. Schiefer confirmed that the call was upgraded to a Code 3 and an ambulance was requested. She then checked the patient's pulse and noted it was faint.

When his unit was dispatched to the Kaiser facility on the evening of August 27, paramedic Arthur Davis and his partner paramedic Frank McMahan were returning to their station at Ortega and 32d Avenue. The initial dispatch directed the unit to 4131 Geary Boulevard where it was to report to a possible drug overdose. Upon arrival, Davis noticed there appeared to be no incident, and he called in that information to secure further instructions. Davis was then told the call was now a Code 3, and they were to enter the building along the Fifth Avenue side. After calling for a fire engine truck, which was standard procedure for a Code 3 call, Davis and McMahan

entered the building and immediately proceeded with patient care, which included airway management, oxygen, and cardiopulmonary resuscitation. Davis and McMahan continued resuscitation efforts for 20 to 25 minutes, without success. At no time during that period did Ms. Chan ever regain a pulse or spontaneous breathing.

McMahan testified that when he and Davis arrived, they found no one at the Geary Boulevard entrance. After Davis called for instructions and they were told to go to the 5th Avenue entrance, the paramedics then loaded their gear back into the ambulance and drove over to the correct entrance. When the paramedics first approached Ms. Chan, CPR had already been performed. Ms. Chan was not breathing and there was no pulse. McMahan noticed some vomitus in her airway, which was not a good sign, because when someone vomits who is not breathing, he or she usually sucks the vomitus back into the lungs, which can be lethal.

Mr. McMahan was upset as he wrote his report because, in part, the original call had come in as an "OD Code 2," which was then later changed to a Code 3. Having worked in the field for 30 years, it was Mr. McMahan's opinion that the medicines he has on board his paramedic unit "would have started her up." He noted that his "save rate" during his 30-year career was 100 percent, explaining that "[i]f they are alive when I get there, they are alive when they get to the hospital."

Davis explained the "Response Time Standards" published by the San Francisco EMS department. Those standards contain response times for both Code 2 and Code 3 paramedic dispatches. The Code 2 response time goal is for the paramedic unit to arrive within 20 minutes of a 911 call being received. There are two types of Code 3 dispatches. The first is denominated a "Life Threatening Code 3 Dispatch" applicable where there is cause to believe that the patient requires resuscitation, there are indications of airway obstruction or choking, or in cases of severe allergic reaction. In those instances, the response-time standard is eight minutes or less for 90 percent of the calls. This is the total time from receipt of the call until arrival at the scene, and includes two minutes to process the 911 call and to dispatch the unit. This leaves a standard time of six minutes "roll time," which is the actual ambulance travel time. Other Code 3 dispatches apply to heart attacks, shortness of breath, asthma attacks, overdoses and poisonings, events which are not immediately life threatening but which could be. In 90 percent of the cases, the response standard from receipt of the 911 call until arrival at the scene is 10 minutes or less.

In responses to request for admissions propounded by appellants, CCSF admitted that the time interval between the initial call concerning Ms. Chan

and the arrival of the police was approximately 10 minutes. The paramedics arrived 10 minutes after the police, for a total actual response time of approximately 20 minutes.

## C. *Procedural History*

Appellants filed an administrative claim with CCSF on September 15, 1998 (Gov. Code, § 945.4), which was denied in writing on September 29, 1998. Thereafter, an action was filed in San Francisco Superior Court on October 26, 1998, which named both CCSF and Kaiser Permanente as defendants. A first amended complaint was filed on May 21, 1999, adding ICSS (Inter-Con Security System) Holding, UCSF-Stanford Health Care, and Kristen Savola, M.D., as defendants, in addition to CCSF and Kaiser.

The first amended complaint alleged three separate causes of action: one for wrongful death, a second for negligent infliction of emotional distress on behalf of Ma, and a third for professional negligence. The complaint's charging allegations are contained in a single Joycean sentence of compound and complex thought, as follows: "Defendants . . . act[ed] with bad faith and wanton indifference toward the grave medical condition of Decedent by, inter alia, prodding the 911 caller to report a drug/alcohol related incident and thereafter showing callous indifference towards Decedent's health and safely by reason of the characterization of the Incident as a drug overdose while ignoring Decedent's pleas that she could not breathe and was dying; by failing to provide timely emergency treatment to Decedent at the scene of the Incident prior to and after the cessation of breathing by Decedent; by failing to prioritize the Incident as a 'Code 3' emergency, thus unduly slowing response time; by improperly concluding and reporting that the incident was a drug overdose; and, by their unduly slow response to the 911 emergency call placed in response to the Incident."[4]

After filing its answer, CCSF filed a motion for summary judgment or, in the alternative, summary adjudication of issues. As relevant to this appeal, CCSF argued that it owed no duty to decedent Ms. Chan, and that, in any event, Government Code section 820.2 afforded it absolute immunity for discretionary acts by government employees. The parties submitted detailed statements of facts both in support of, and in opposition to the motion.

On May 8, 2000, the trial court ruled by granting the motion on both grounds. More particularly, the court concluded in material part: "1. There is

---

[4]The breadth of this paragraph was obviously inspired by the fact that multiple defendants were named and appellants chose to consolidate their charging allegations in a single sentence. Ultimately, the complaint against Kaiser was dismissed, while ICSS extricated itself via an uncontested motion for summary judgment. There is no indication in the record of whether UCSF-Stanford or the named physician was served with a summons and complaint.

no triable issue of material fact as to whether [CCSF] had a duty to [Ms.] Chan. . . . [¶] 2. There is no triable issue of material fact as to whether [CCSF] is entitled to discretionary act immunity pursuant to section 820.2 of the California Government Code and the case of *Sullivan v. City of Sacramento* (1987) 190 Cal.App.3d 1070 [235 Cal.Rptr. 844]. Defendant's Undisputed Facts Supporting Summary Judgment . . . establish that the actions of 911 call-taker Martha Cody involved her personal deliberations, decision and judgment, and, therefore, warrant as a matter of law, such immunity." This timely appealed followed.

## III.

### LEGAL DISCUSSION

#### A. *Interplay Between Duty and Immunity*

■ Although related, the concepts of duty and immunity—both of which guide our decision here—invoke separate analyses. Where no legal duty is found owing to the injured party, the court need not determine if one or more statutory immunities apply so as to insulate the entity and employee from liability. (See, e.g., *Stout v. City of Porterville* (1983) 148 Cal.App.3d 937, 948 [196 Cal.Rptr. 301]; *Allen v. Toten* (1985) 172 Cal.App.3d 1079, 1091-1092, fn. 11 [218 Cal.Rptr. 725].) Consequently, "[i]n sorting out the issues presented, we must follow a logical sequence of inquiry, keeping in mind that conceptually, questions of statutory immunity do not become relevant until it has been determined that the government entity owes a duty of care to the plaintiff and would be liable in the absence of such immunity. . . ." (*Walt Rankin & Associates, Inc. v. City of Murrieta* (2000) 84 Cal.App.4th 605, 612-613 [101 Cal.Rptr.2d 48], citing *Davidson v. City of Westminster* (1982) 32 Cal.3d 197, 201-202 [185 Cal.Rptr. 252, 649 P.2d 894].) "So deeply rooted is this decision tree that the Supreme Court in *Williams* v. *State of California* (1983) 34 Cal.3d 18 [192 Cal.Rptr. 233, 664 P.2d 137] (*Williams*), chided trial and intermediate appellate courts that '[o]nce again the immunity cart has been placed before the duty horse.' (*Id.* at p. 22.)" (*Adams v. City of Fremont* (1998) 68 Cal. App. 4th 243, 263 [80 Cal.Rptr.2d 196] (*Adams*).)

■ Accordingly, we first decide whether CCSF owed a duty of due care to citizens who use its 911 EMS, employing a traditional, common law duty analysis. Only after a duty is found do we address whether that duty is limited or absolved by various statutory enactments.

B. *Doctrinal Basis for Determining Tort Liability—Existence of a Duty*

 Since 1872, the fundamental principle underlying common law tort doctrine has been codified in Civil Code section 1714: "Every one is responsible, not only for the result of his willful acts, but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person, except so far as the latter has, willful or by want of ordinary care, brought the injury upon himself."

Although the statute has been described as the embodiment of civil law (*Rowland, supra,* 69 Cal.2d at p. 112), to the extent the statute is consistent with common law principles, it has been viewed as a continuation of the common law and not as a new enactment. (Civ. Code, § 5; *Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804, 815 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393] (*Li*).) Acceptance of the concept that the Civil Code is a continuation of the common law has " 'created an atmosphere in which Code interpretation could more easily partake of common law elasticity.' . . ." (*Li, supra,* 13 Cal.3d at p. 816.) However, based on its primacy as a statute, it has been repeated countless times over decades by our high court that, since Civil Code section 1714 allows for no exception from its language establishing a general duty of care applicable to all, no exceptions should be created by the courts unless clearly supported by public policy. (*Rowland, supra,* 69 Cal.2d at p. 112; *Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 477 [110 Cal.Rptr.2d 370, 28 P.3d 116].)

 As we have said before about our obligation to consider the scope of tort duty: "The existence of a duty of care is a question of law to be determined by the court alone. (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 572, fn. 6 [224 Cal.Rptr. 664, 715 P.2d 624]; *Stout [v. City of Porterville], supra,* 148 Cal.App.3d at p. 942; *Peter W. v. San Francisco Unified Sch. Dist.* (1976) 60 Cal.App.3d 814, 822 [131 Cal.Rptr. 854]; *Raymond v. Paradise Unified School Dist.* (1963) 218 Cal.App.2d 1, 8 [31 Cal.Rptr. 847].) This is because 'legal duties are . . . merely conclusory expressions that, in cases of a particular type, liability should be imposed for damage done.' (*Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 434 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166].) Duty is simply a shorthand expression for the sum total of policy considerations favoring a conclusion that the plaintiff is entitled to legal protection. (*Dillon v. Legg* (1968) 68 Cal.2d 728, 734 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316].)" (*Adams, supra,* 68 Cal.App.4th at p. 265.)

## C. *Traditional Duty Analysis*

■ "Since *Rowland* was decided, its innumerable judicial descendants have adopted the *Rowland* court's multi-element duty assessment in determining whether a particular defendant owed a tort duty to a given plaintiff.[5] These factors include: (1) the foreseeability of harm to the injured party; (2) the degree of certainty that the injured party suffered harm; (3) the closeness of the connection between the defendant's conduct and the injury suffered; (4) the moral blame attached to the defendant's conduct; (5) the policy of preventing future harm; (6) the extent of the burden to the defendant; and (7) the consequences to the community of imposing a duty to exercise care, with resulting potential liability. (*Rowland, supra*, 69 Cal.2d at pp. 112-113.) Where a public entity is involved, the court considers the following additional factors: the availability, cost, and prevalence of insurance for the risk involved; the extent of the agency's powers; the role imposed on it by law; and the limitations imposed on it by budget. [Citations.]

"In *Parsons v. Crown Disposal Co.* (1997) 15 Cal.4th 456 [63 Cal.Rptr.2d 291, 936 P.2d 70] (*Parsons*), our Supreme Court has recently reiterated that in analyzing duty under the *Rowland* standard, ' " '[d]uty' is not an immutable fact of nature ' "but only an expression of the sum total of those *considerations of policy* which lead the law to say that the particular plaintiff is entitled to protection." ' [Citation.]" ' (*Id.* at p. 472, original italics.) . . . Thus, we examine the multipart *Rowland* test as it applies to the circumstances before us, exploring the policies endemic to each prong of that standard while remaining mindful of the Supreme Court's pronouncement that the first policy consideration in duty analysis is '["[t]he social utility of the activity out of which the injury arises."]' (*Ibid.*, fn. omitted.)" (*Adams, supra*, 68 Cal.App.4th at pp. 267-268.)

### 1. *Foreseeability*

■ "In examining the critical element of foreseeability of harm, we must adhere to the rule that '[f]oreseeability supports a duty only to the extent the foreseeability is reasonable.' (*Sturgeon v. Curnutt* (1994) 29 Cal.App.4th 301, 306 [34 Cal.Rptr.2d 498] (*Sturgeon*); *Rowland, supra*, 69 Cal.2d at p. 113.) . . . Basically, '[t]he reasonableness standard is a test which determines if, in the opinion of a court, the degree of foreseeability is high enough to charge the defendant with the duty to act on it.' (*Sturgeon, supra*,

---

[5]"The precursor standard for assessing duty using a multistep procedure rather than simply relying on the foreseeability of harm was set forth in *Biakanja* v. *Irving* (1958) 49 Cal.2d 647 [320 P.2d 16, 65 A.L.R.2d 1358]. Nevertheless, greater attribution for the test is given to *Rowland.*"

29 Cal.App.4th at p. 307.)" (*Juarez v. Boy Scouts of America, Inc.* (2000) 81 Cal.App.4th 377, 402 [97 Cal.Rptr.2d 12] (*Juarez*).)

One test to apply to the facts in determining if the harm was foreseeable is "whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may be appropriately imposed on the negligent party. [Citation.]" (*Martinez v. Bank of America* (2000) 82 Cal.App.4th 883, 895 [98 Cal.Rptr.2d 576].) "If injury to another ' " 'is likely enough in the setting of modern life that a reasonably thoughtful [person] would take account of it in guiding practical conduct' " [citations], we must label the injury "reasonably foreseeable" and go on to balance the other *Rowland* considerations.' (*Sturgeon, supra,* 29 Cal.App.4th at p. 307.)" (*Juarez, supra,* 81 Cal.App.4th at pp. 402-403.)

 Foreseeability is not seriously contested here. The very *raison d'être* for emergency medical services is to preserve human life. The protocols established by CCSF to govern its EMS dispatching were designed to allow dispatchers to discern as quickly as possible whether a call concerns a life-threatening situation requiring the fastest possible response. The conclusion that a failure to exercise due care in performing dispatching duties is likely to result in injury or death to 911 callers is manifestly clear and does not require further elucidation. This element of the *Rowland* factors having clearly been met, we move on, for "[b]ecause the bar of foreseeability is set so low, foreseeability alone is insufficient to create a legal duty to prevent harm. [Citations.]" (*Adams, supra,* 68 Cal.App.4th at p. 269.)

### 2. *Degree of Certainty That the Plaintiff Suffered Injury and Closeness of the Causal Relationship*

The degree of certainty that Ms. Chan suffered injury on the night of August 27, 1998, is absolute. CCSF instead contends that her death bore no causal relationship to Ms. Cody's dispatching activities. As we have said before in another context, the nexus between the questioned conduct and the injury is "significantly different from that needed to satisfy a *factual* determination of proximate cause. Proximate causation requires simply that the act or omission of the defendant be a 'substantial [contributing] factor' to the harm suffered. (*Mitchell v. Gonzales* (1991) 54 Cal.3d 1041 [1 Cal.Rptr.2d 913, 819 P.2d 872].) In determining the existence of a duty, we must assess not only the fact that a causative relationship exists but also we must quantify that connection in balance with the other *Rowland* factors." (*Adams, supra,* 68 Cal.App.4th at p. 269.)

The record on summary judgment, while not fully developed, contains sufficient direct and indirect evidence to support the conclusion that the

connection between the response to the 911 call from Kaiser's French Campus and Ms. Chan's death is temporal and strong. First, despite the parties' disagreement as to whether Ms. Cody properly interpreted the call, it is clear that it was reported that Ms. Chan complained of an inability to breath. If this complaint mandated a "Life[-]Threatening Code 3 Dispatch[]" response under CCSF's response time standards published by the EMS department, there is a 90 percent chance that assistance would have arrived within eight minutes of the 911 call being received. Additionally, paramedic Frank McMahan was upset when he discovered the call originated as a Code 2 dispatch, requiring instead a response time of 20 minutes under CCSF standards. He testified at deposition that he and his partner had medications on board their ambulance which would have "started [Ms. Chan] up" had they gotten to the scene on time, and that his Code 3 "save rate" was "100 percent" over a 30-year career as a paramedic; "If they are alive when I get there, they are alive when they get to the hospital."

Further, CCSF admitted in interrogatories that the dispatch call to the paramedic unit did not occur until 11 minutes, 51 seconds after the 911 call was received. It is estimated that the police officers arrived at the Kaiser French Campus facility 10 minutes after the 911 call was placed. The paramedics arrived approximately 10 minutes later, for a total actual response time of 20 minutes.

Given this evidence, we are compelled to agree with appellants that the causal connection between the challenged conduct and injury is neither "weak" not "remote." (*Adams, supra,* 68 Cal.App.4th at p. 270.) Thus, this factor also favors the finding of duty.

### 3. *Moral Blame*

In order to avoid overlap and redundancy, "moral blame" as a public policy factor is more than the answer to the question "was the defendant negligent?" (*Merenda v. Superior Court* (1992) 3 Cal.App.4th 1, 10-11 [4 Cal.Rptr.2d 87].) As we noted in *Adams*: "Instead, courts have required a higher degree of moral culpability such as where the defendant (1) intended or planned the harmful result (see, e.g., *McCollum v. CBS, Inc.* (1988) 202 Cal.App.3d 989, 1005 [249 Cal.Rptr. 187]); (2) had actual or constructive knowledge of the harmful consequences of their behavior (see, e.g., *Rosenbaum v. Security Pacific Corp.* (1996) 43 Cal.App.4th 1084, 1098 [50 Cal.Rptr.2d 917]); (3) acted in bad faith or with a reckless indifference to the results of their conduct (see, e.g., *Dutton* [*v. City of Pacifica* (1995)] 35 Cal.App.4th [1171,] 1176 [41 Cal.Rptr.2d 816]; *Merenda v. Superior Court, supra,* 202 Cal.App.3d at p. 11); or (4) engaged in inherently harmful acts

(see, e.g., *Scott* v. *Chevron U.S.A.* (1992) 5 Cal.App.4th 510, 517 [6 Cal.Rptr.2d 810])." (*Adams, supra,* 68 Cal.App.4th at p. 270.)

We believe appellants have presented a constellation of facts supporting the conclusion that the conduct of CCSF was morally blameworthy. These facts include, first and foremost, CCSF's failure to take steps to ensure that dispatchers were trained in the dispatching protocols painstakingly implemented by CCSF for its EMS, a service freely acknowledged by city officials as being vital to the health and safety of both residents and visitors to San Francisco. These protocols facially mandated that, based on the symptoms reported on behalf of Ms. Chan, the call be assigned a Code 3 status, the highest available. Had that been done, there is ample evidence presented in opposition to CCSF's motion for summary judgment supporting the inference that her life would have been saved. Not only was the dispatcher on duty that evening, Ms. Cody, not trained in CBD (she was the following month), but also she was unaware that a copy of the CBD protocols were available on her console for her use.

Furthermore, there was evidence adduced on summary judgment indicating Ms. Cody refused to act on the symptoms reported by the two Kaiser security guards who placed the 911 call. Instead, she embarked on a speculative investigation into the cause of Ms. Chan's breathing distress, which wasted precious time—time which apparently could have been applied successfully in averting the tragedy. Indeed, both Dr. Brown, as well as the printed CBD protocols, states that the *cause* of the reported life-threatening symptom is irrelevant to making an appropriate emergency response. Someone who loses the ability to breathe needs immediate attention regardless of whether the cause of the difficulty is from asthma, drug induction, or food ingestion. Certainly, there were insufficient bases justifying Ms. Cody's recordation of Ms. Chan's condition as "OD bizzare [*sic*] aggressive violent."

Similarly, there was no factual basis justifying delaying dispatch of an ambulance to the scene while police investigated to ensure the scene was "safe and secure." Nor was there an adequate reason to question either the safety or security of the scene based on the report made by the security guards. Surely, if security concerns were present, one or both of the security guards making the call would have requested police assistance.

The totality of these circumstances suggest more than negligence. At a minimum, they exhibit an indifference that is intolerable in the important life and death context in which this critical public service is rendered. Therefore, we share appellants' view that CCSF's conduct was morally blameworthy.

### 4. *Policy of Preventing Future Harm, the Consequences to the Community and the Extent of Burden of Duty on CCSF*

The statewide Emergency Medical Services System and the Pre-hospital Emergency Medical Care Personnel Act (EMS Act) (Health & Saf. Code, § 1797 et seq.) is a prolix statutory scheme comprised of more than 100 sections spread over nine separate chapters, "creat[ing] a comprehensive system governing virtually every aspect of prehospital emergency medical services." (*County of San Bernardino v. City of Bernardino* (1997) 15 Cal.4th 909, 915 [64 Cal.Rptr.2d 814, 938 P.2d 876].) It is abundantly clear that this prodigious legislative response evokes recognition that one of the preeminent functions of government in an organized society is the protection of the life and health of its citizens. Along with fire suppression and crime prevention, the provision of emergency medical assistance to persons faced with imminent life-threatening conditions joins with them to form a triage of public services considered at the core of vital civic functions.

Accordingly, the EMS Act and public policy generally favor encouraging public entities to undertake the provision of these services with the utmost competence and efficiency, and requires that they be assigned the highest urgent priority; otherwise, the consequences to the community are grave. Improper training of dispatchers or less than competent implementation of EMS protocols doubtlessly will lead to the unnecessary loss of lives. As noted in the legislative materials chronicling more than a decade of debate over expanding the limited tort liability for dispatching services, members of the public are entitled to rely on their government's willingness to devote whatever resources are needed to ensure that emergency medical services reach the highest feasible level of what may still be an imperfect human endeavor.[6] Similarly, the policy of preventing future harm is furthered by holding our local governments accountable where due care is not exercised by those entrusted with this important public duty.

Yet CCSF argues that imposing a tort duty will have outweighing negative consequences to the community because the specter of liability will encourage dispatchers to make a more "tentative response," citing *Adams*, *supra*, 68 Cal.App.4th at page 272. First, we observe that this hypothesis is directly contrary to the arguments made by public entities in the legislative arena when the Legislature has considered curtailing tort liability for emergency medical dispatching services. Their view has been that a potential consequence of not immunizing dispatchers is that it will lead to *over-response*, thus wasting public resources, and perhaps rendering the agency unable to respond appropriately in needed cases. (Assem. Com. on Judiciary, Rep. on

---

[6]See discussion under part III.D., *post*.

Assem. Bill No. 1980 (1989-1990 Reg. Sess.) May 30, 1990, com. 1(c).) We agree that a more legitimate concern is the possibility that dispatchers may respond more aggressively if their actions might subject them and their employing entity to a tort action. To that extent, CCSF's fear of an *under-response* is both counterintuitive and illogical.

As to over-responses, we note that it already is the policy of CCSF that all doubts as to the appropriate response are to be resolved in favor of the more aggressive one. Dr. Brown acknowledges that it is the "default" position that a Code 3 dispatch should be made where any applicable criterion is present, and regardless of whether the dispatcher is unsure of the patient's true condition, or in the absence of other relevant information. He concludes that, "when in doubt, better to send faster than slower." Thus, if one of the results of potential liability is over response, that consequence is consistent with the policy of CCSF's existing EMS program.

A second concern expressed in the legislative materials, but which is not advanced by CCSF in its brief, is the possibility that, by exposing dispatchers to individual liability, it will shrink the pool of job applicants thus requiring municipalities to lower their hiring standards. Therefore, rather than ensuring higher quality EMS services, imposing a tort duty achieves the opposite result. (Assem. Com. on Judiciary, Rep. on Assem. Bill No. 1980 (1989-1990 Reg. Sess.), May 30, 1990, com. 1(d).) There is nothing in either the legislative materials or in the trial record in this case that would support this argument factually.

In addition, by statute public entities must provide a defense upon request to public employees sued for injuries they cause while acting within the scope of their public employment, and indemnify these employees from any judgment, compromise or settlement. (Gov. Code, § 825, subd. (a); see also Gov. Code, § 995; *Wright v. Compton Unified Sch. Dist.* (1975) 46 Cal.App.3d 177 [120 Cal.Rptr. 115].) While subject to several exceptions, (Gov. Code, § 825, subds. (b)-(f)), none seem applicable here. Thus, although dispatchers may be sued individually (Gov. Code, § 820, subd. (a)), the cost of defending that action and any resultant judgment obtained against the employee must be paid by the public entity.

On balance we conclude that this *Rowland* factor favors appellants.

5. *The Availability, Cost, and Prevalence of Insurance for the Risk Involved*

Certainly, as to the individual employees, this is not an issue, as they are entitled to a defense and indemnification by their employing agency. As to

CCSF itself, there is no evidence in the record bearing on this factor, and therefore, it appears to be a neutral factor.

6. *The Extent of the Agency's Powers, the Role Imposed Upon It by Law, and the Limitations Imposed Upon It by Budget*

We have already addressed the importance of CCSF's role in administering its 911 telephone services. It serves as a lifeline for citizens and visitors faced with serious medical conditions demanding immediate attention. The extent of CCSF's power to provide 911 EMS services is immense. These considerations militate in favor of a tort duty, which is commensurate with the importance of the entrusted public function.

The only additional consideration is to what extent imposing a tort duty would be unfair to a public entity due to budgetary constraints. (*Thompson v. County of Alameda* (1980) 27 Cal.3d 741, 750 [167 Cal.Rptr. 70, 614 P.2d 728, 12 A.L.R.4th 701].) We disagree with CCSF that imposing a duty on it in this context would subvert the public interest by reallocating financial resources of the city to the benefit of individual claimants. CCSF already has in place an extensive EMS program based on CBD protocols, a system not challenged by appellants. Also, CCSF is devoted to providing the type of training on an ongoing basis to best ensure that properly qualified and trained EMS personnel staff its dispatching consoles. Thus, the instant case does not present the concern expressed in *Adams* that "imposing a duty on law enforcement to take reasonable steps to prevent a threatened suicide would have significant budgetary implications and improperly insinuate the civil justice system into the allocation of law enforcement resources." (*Adams, supra,* 68 Cal.App.4th at p. 276.)

It is true that imposing a duty will likely cause some incremental increase in litigation arising out the handling of 911 telephone calls seeking medical help. But we question the validity of CCSF's concern that a litigation explosion will likely result. To the contrary, since 1980, when the EMS Act was first enacted, there have been no appellate decisions addressing the question we confront today. In the absence of settled law there presumably has been no deterrent to lawsuits based on the type of misconduct alleged in this case. This paucity of cases implies that the litigation explosion expected in the 911 context has not, and will not, detonate.

In any event, we cannot allow such conjectural questions to depreciate the palpable countervailing public policies present here which support a duty. While the question of whether immunity should be afforded public entities for dispatching activities may continue to be debated in the legislative arena,

we will not judicially immunize these activities by refusing to recognize the existence of a duty of care.

## 7. *Balancing*

As is quite evident, virtually all the individual *Rowland* factors favor duty overwhelmingly. For this reason, the trial court erred in finding there "is no triable issue of material fact as to whether [CCSF] had a duty to [Ms.] Chan. . . ."[7] The next question is whether CCSF is entitled to any statutory immunity.

## D. *Scope of Immunity Afforded by Health and Safety Code[8] Section 1799.107*

Chapter 9 of the EMS Act contains several statutes expressly providing absolute or limited immunities to certain classes of participants in EMS programs. For example, as part of the original statutory scheme, section 1799.100 immunizes private and public entities engaged in EMS training from any civil liability arising from those training programs. (*McAlexander v. Siskiyou Joint Community College* (1990) 222 Cal.App.3d 768 [272 Cal.Rptr. 70] [immunity applies not only to third persons but also to trainee who sustains personal injuries during EMS training exercise].) Persons rendering noncompensatory emergency care in good faith at the scene of an emergency are immunized (§ 1799.102), as are physicians and nurses who transmit emergency medical instructions in good faith to EMT-II's and paramedics at the scene of an emergency (§ 1799.104, subd. (a).) Similarly, those EMT-II's and paramedics who rely in good faith and without negligence on those instruction are otherwise immune from civil liability (§ 1799.104, subd. (b)). Protected by immunity in one degree or other[9] is the medical director of poison control centers that meet certain statutory standards (§ 1799.105, subd. (a)), and poison information specialists or information providers who are engaged in providing emergency "information and advice for no charge on the management of exposures to poisonous or toxic substances . . . ." Firefighters, police, and persons certified to provide prehospital emergency field care are given limited immunity (§§ 1799.106 &

---

[7]Because we have found the multifactored, policy-driven *Rowland* analysis supports imposing tort liability in this case, we need not address appellants' subsidiary argument that a duty may be imposed based on the "special relationship" doctrine.

[8]Unless otherwise indicated, all statutory references in this section are to the Health and Safety Code.

[9]The section providing immunity for poison control center operations specifies different levels of immunity depending on the status of the center, the status and content of the center's protocol, and the role played by center employees, including the director, whose actions are challenged. (§ 1799.105, subds. (a)-(c).)

1799.108), as well as physicians and surgeons at general acute care hospital emergency departments (§ 1799.110).

Haunting our analysis is the effect, if any, another later-enacted limited immunity statute, section 1799.107, has on defining the parameters of the duty owed by CCSF in this case.

Section 1799.107[10] was enacted with other amendments in 1984, four years after the EMS Act was first codified. This additional limited immunity offers a shield against liability for "emergency rescue personnel" who provide "emergency services" unless their actions are proven to have been grossly negligent or performed in bad faith. "Emergency rescue personnel" were defined as "any person who is an officer, employee, or member of a fire department or fire protection or firefighting agency . . . whether that person is a volunteer or partly paid or fully paid, while he or she is actually engaged in providing emergency services as defined by subdivision (e)." (§ 1799.107, subd. (d).) " '[E]mergency services' includes, but is not limited to, first aid and medical services, rescue procedures and transportation, or other related activities necessary to insure the health or safety of a person in imminent peril." (§ 1799.107, subd. (e).)

In supplemental briefing on the ramifications of section 1799.107 to the issues presented by this case, both parties assume that this immunity applies to the conduct of 911 emergency dispatchers as well as the classes of persons and activities specifically enumerated in the statute. However, they part

[10]"(a) The Legislature finds and declares that a threat to the public health and safety exists whenever there is a need for emergency services and that public entities and emergency rescue personnel should be encouraged to provide emergency services. To that end, a qualified immunity from liability shall be provided for public entities and emergency rescue personnel providing emergency services.

"(b) Except as provided in Article 1 (commencing with Section 17000) of Chapter 1 of Division 9 of the Vehicle Code, neither a public entity nor emergency rescue personnel shall be liable for any injury caused by an action taken by the emergency rescue personnel acting within the scope of their employment to provide emergency services, unless the action taken was performed in bad faith or in a grossly negligent manner.

"(c) For purposes of this section, it shall be presumed that the action taken when providing emergency services was performed in good faith and without gross negligence. This presumption shall be one affecting the burden of proof.

"(d) For purposes of this section, 'emergency rescue personnel' means any person who is an officer, employee, or member of a fire department or fire protection or firefighting agency of the federal government, the State of California, a city, county, city and county, district, or other public or municipal corporation or political subdivision of this state, or of a private fire department, whether that person is a volunteer or partly paid or fully paid, while he or she is actually engaged in providing emergency services as defined by subdivision (e).

"(e) For purposes of this section, 'emergency services' includes, but is not limited to, first aid and medical services, rescue procedures and transportation, or other related activities necessary to insure the health or safety of a person in imminent peril."

company on whether section 1799.107 evinces legislative recognition of a duty owed by persons such as Ms. Cody not to perform 911 emergency medical dispatching services in a grossly negligent manner or in bad faith. Contrary to the positions taken by the parties, our review of the legislative history of section 1799.107, including that relating to subsequent attempts to amend the section, leads us to conclude that the limited immunity codified in section 1799.107 does not extend to 911 dispatching.

In early 1983, Division Five of this appellate district issued its opinion in *Lewis v. Mendocino Fire Protection Dist.* (1983) 142 Cal.App.3d 345 [190 Cal.Rptr. 883]. In that case, the plaintiff received personal injuries when rescue workers with the Mendocino Volunteer Fire Department negligently tried to remove a tree that had fallen on the plaintiff's tent, trapping him inside. (*Id.* at pp. 346-347.) This decision held that the immunity from government tort liability for "any injury caused in fighting fires" (Gov. Code, § 850.4) did not apply to fire department rescue activities not involving conflagrations. (*Lewis,* at p. 347.)

Section 1799.107 was a response to this decision: "1. The author believes that this bill is a necessary response to the *Lewis* decision, in which the First District Court of Appeals [*sic*] ruled that fire personnel had no statutory immunity while conducting rescue operations. This bill would provide statutory immunity in these cases if the actions are not performed in bad faith or in a grossly negligent manner. . . . [¶] . . . [¶] 2. The proponents argue that the *Lewis* decision will have a chilling effect on fire departments' willingness to respond to life-threatening but non-fire-related emergencies and that this bill would provide fire personnel with the necessary immunity to encourage them to continue to respond to emergencies." (Assem. Com. on Judiciary, Rep. by Consultant M. Crouter on Sen. Bill No. 1120 (1983-1984 Reg. Sess.) as amended Aug. 16, 1983, p. 2.) The issue of whether the proposed limited immunity extended to those engaged in 911 medical emergency dispatching, regardless of whether they were employees of fire departments, was simply not addressed in any of the numerous reports of legislative bodies and committees reviewing the bill.

However, beginning in 1990,[11] and continuing without resolution to today, both the legislative and executive branches have rejected repeated attempts to amend section 1799.107 specifically to expand its limited immunity to include 911 medical emergency dispatching. For example, Senate Bill No.

---

[11]From 1984 to 1990, only one attempt was made to amend section 1799.107. That came in 1989 when an unsuccessful Senate bill sought to change the qualified immunity to absolute immunity. (See Sen. Bill No. 762, introduced Mar. 1, 1989 (Legis. Counsel's Dig., Sen. Bill No. 762 (1989-1990 Reg. Sess.).)

1980, introduced in 1990, sought just such a change. As noted by the Assembly Subcommittee on the Administration of Justice, "[t]his bill amends the definition of 'emergency rescue personnel' to include public entity employees (or volunteers) who are responsible for receiving and processing calls for emergency assistance and for dispatching personnel to respond to the calls." (Assem. Com. on Judiciary, Rep. on Sen. Bill No. 1980 (1989-1990 Reg. Sess.) as amended May 30, 1990.) The proposed bill would have also amended the definition of "emergency services" in the statute to include specifically "receiving and processing calls for emergency assistance and for dispatching personnel to respond to the calls." (*Ibid.*)

The report went on to note that the amendment was sponsored by the City of Los Angeles, which had been sued several times for alleged negligent dispatching, with trial courts rendering contradictory rulings as to whether section 1799.107 applied to these services. In addition to arguing the amendment would simply clarify that emergency dispatching was indeed covered by the original statute, the sponsors also argued there was a public need to provide this immunity to cover this "increasingly critical component of public entities' emergency response systems." (Assem. Com. on Judiciary, Rep. on Sen. Bill No. 1980 (1989-1990 Reg. Sess.) par. 1(b).) The amendment was ostensibly needed in order to curtail a perceived inefficient practice by which dispatchers overresponded to emergency calls for fear of liability, and because of the reported difficulty some public entities were experiencing in hiring.

Opposed to the amendment was the California Trial Lawyers Association (CTLA), which made countervailing public policy arguments including the need to hold public entities accountable when performing an important public function relied on by taxpayers in life-threatening situations. Also, it was argued that the absence of immunity ensured that public entities continued to provide only the highest quality dispatcher services. The Senate Committee on the Judiciary made similar observations in its review of the bill. On November 30, 1990, the bill was returned from the Assembly without further action.

Senate Bill No. 1053 was introduced the following legislative year. Similar to Senate Bill No. 1980, Senate Bill No. 1053 would have added provisions designed to meet the objections raised to Senate Bill No. 1980. For example, Senate Bill No. 1053 proposed affording the same limited immunity provided in section 1799.107 to EMS dispatchers. However, in return, the bill required the statewide Emergency Medical Services Authority to develop and implement guidelines for use by local agencies for their dispatching services, and to establish minimum standards by regulation for

the training, certification, and practices for EMS dispatchers. It also required local agencies to ensure compliance with these state standards, but allowed them to establish a fee schedule, the proceeds from which would be used to meet the state requirements for training and certification. (Legis. Counsel's Dig., Sen. Bill No. 1053 (1991-1992 Reg. Sess.).) Because of the financial implications of the compliance and certification requirements of the bill, it was opposed by the state Department of Finance as well as the CTLA. The bill passed the state Senate but failed to come up for a vote in the Assembly. (Sen. Bill No. 1053, Sen. Final Hist. (1991-1992 Reg. Sess.) p. 778.)

In August 1994, another bill, Assembly Bill No. 12, passed both the Assembly and Senate and was sent to the Governor for signature. This bill sought to add section 855.9 to the Government Code, which would extend limited immunity to public entities and employees who "in good faith and without gross negligence provides appropriate prearrival medical instructions, including, but not limited to, cardiopulmonary resuscitation (CPR) instructions . . . as part of his or her duties in operation of a local emergency telephone system . . . ." (Legis. Counsel's Dig., Assem. Bill No. 12 (1993-1994 Reg. Sess.).) The immunity would only be available where the involved employee has satisfactorily completed a course of training that met the standards of one of several described training programs.

However, subdivision (d) included the following language: "Nothing in this section shall be construed to apply to, alter, or otherwise limit any immunity provided by any other section to a public entity or public employee providing emergency dispatch services. Nothing in this section shall be construed to apply to or alter in any way the liability of a public entity or public employee with respect to either of the following: (1) The decision to dispatch personnel or equipment in response to a telephone request received by the '911' emergency telephone system, *including any delay in the decision to dispatch. . . .*" (Legis. Counsel's Dig., Assem Bill No. 12 (1993-1994 Reg. Sess.), italics added.) The statute was to "sunset" on January 1, 1998, unless it was deleted or extended by the Legislature. (*Ibid.*)

On September 30, 1994, Governor Wilson vetoed Assembly Bill No. 12. In his veto message, the Governor stated: "AB 12 is the product of an exhaustive multi-year effort by firefighters, emergency workers, and other concerned citizens who have sought to provide communities throughout California with assurances that, if they acted in good faith, they could provide CPR and other '911' emergency assistance without threat of liability." The Governor's message went on to explain that tying the immunity to "adherence to a strict protocol" created a "presumption of negligence in the absence of full compliance." Thus, rather than eliminating liability, it was

the Governor's view that the "checklist of statutory hurdles, creates more, not fewer, grounds under which medical dispatchers may be sued . . . it will create the very lawsuits it was intended to prevent." (Governor's veto message to Assem. on Assem. Bill No. 12 (Sept. 30, 1994).)

The following year, Assembly Bill No. 1488, a simpler bill, was introduced in the Assembly. This bill sought only to amend section 1799.107 specifically to include dispatchers within the scope of the limited immunity afforded by the statute. Sponsored again by Los Angeles, the Los Angeles City Attorney was quoted in the Assembly Committee on Judiciary report as saying: "Telephone dispatchers . . . have never been specifically included in the statutes applicable to emergency medical services. It has long been this City Attorney's opinion, however, that their actions constitute 'emergency services' . . . ." (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 1488 (1995-1996 Reg. Sess.) coms.) This bill passed in the Assembly but never came up for a vote in the Senate that legislative year. (Assem. Bill No. 1488 (1995-1996 Reg. Sess.) complete bill hist.)

Finally, in 1998, another Assembly bill, Assembly Bill No. 2173, proposed to amend several statutes, including 1799.107, to include firefighters employed by private entities. The apparent purpose of this bill was to conform state law to allow workers' compensation benefits to be paid to injured privately employed firefighters providing emergency services although the activity may be prohibited by the local public entity where the injury or death takes place. The issue of immunizing 911 dispatchers or public entities for their acts was not addressed in the bill. Assembly Bill No. 2173 passed both houses, and was signed by the Governor. (Stats. 1998, ch. 617, § 1.)

This legislative history once again proves the acuity of Benjamin Cardozo's observation 80 years ago that "[s]tatutes are designed to meet the fugitive exigencies of the hour."[12] Section 1799.107 was enacted specifically to shield from potential liability firefighters engaged in rescue operations not involving fire suppression activities; a protection ostensibly lost by a single interpretive court decision. When the statute was first enacted not a word was mentioned about extending the immunity beyond the contextual setting which instigated the law. The parties' view, and that of the Los Angeles City Attorney for that matter, that the statutory reference to "related activities" evinces legislative intent to have the immunity apply to 911 dispatching services is facially unconvincing, and conflicts with 15 years of profound legislative debate on this very issue. The fact is telling that, for whatever reason, both the legislative and the executive branches have rejected specific

---

[12]Cardozo, The Nature of the Judicial Process (Yale Univ. Press 1921) page 83.

and repeated attempts to amend the statute. Concluding as we have that the Legislature has consciously refused to extend the limited immunity provided by section 1799.107 to public entities and their employees engaged in dispatching emergency medical services, we refuse to do so unilaterally by judicial fiat.

### E. Discretionary Immunity Conferred by Government Code Section 820.2

Appellants next challenge the trial court's conclusion that CCSF's acts or omissions are protected from liability by the statutory immunity for discretionary acts set forth in Government Code section 820.2. Section 820.2 provides: "Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused."

Albeit arising within another factual context, the recent California Supreme Court decision in *Barner v. Leeds* (2000) 24 Cal.4th 676 [102 Cal.Rptr.2d 97, 13 P.3d 704] (*Barner*), reprises case law interpreting this section, and itself further illuminates the scope of Government Code section 820.2. Because it offers authoritative and binding analysis applicable to this case, we examine *Barner* at some length.

The issue before the Supreme Court in *Barner* was whether a criminal defendant's suit against his assigned public defender for legal malpractice was barred by the immunity for discretionary acts set forth in Government Code section 820.2. (*Barner, supra*, 24 Cal.4th at p. 679.) The court's analysis commenced with a review of its decisions clarifying the general breadth of the immunity statute. Noting that not all circumstances requiring public employees to "choose among alternatives" constitute "discretionary" acts (*id.* at pp. 684-485), the court explained further: "Under [section 820.2], '[i]mmunity is reserved for those "basic policy decisions [which have] . . . been [expressly] committed to coordinate branches of government," and as to which judicial interference would thus be "unseemly." [Citation.] Such "areas of quasi-legislative policy-making . . . are sufficiently sensitive" [citation] to call for judicial abstention from interference that "might even in the first instance affect the coordinate body's decision-making process" [citation].' [Citations.] On the other hand, there is no basis for immunizing lower level decisions that merely implement a basic policy already formulated. (*Ibid.*) The scope of the discretionary act immunity 'should be no greater than is required to give legislative and executive policymakers sufficient breathing space in which to perform their vital policymaking functions.' [Citation.]" (*Id.* at p. 685, italics omitted.)

Distinguishing between "operational" and "policy" decisions, the latter of which are likely to occur at the planning stages of governmental action, the court turned to several analogies in the health care context that have particularly relevance to the facts of this case as well. For example, it discussed its earlier decision in *Tarasoff v. Regents of University of California, supra,* 17 Cal.3d 425 (*Tarasoff*), which held that psychologists employed by a governmental entity are not immunized for their failure to warn third persons about the risk of harm posed by a patient. The court reasoned that the decision by a mental health care professional whether to disclose the existence of such a risk may indeed involve the exercise of considerable professional judgment, but nevertheless, these types of considered opinions do not "rise to the level of a basic policy decision for which the statute provides immunity. . . ." (*Barner, supra,* 24 Cal.4th at p. 686, citing *Tarasoff, supra,* 17 Cal.3d at pp. 446-447.)

The court in *Barner* then extended the analogy by referring to Government Code section 855.6,[13] which affords immunity to publicly employed health care professionals who fail to perform examinations to determine if the health or safety of either the party examined, or others, is endangered. Because the statute expressly does not extend to examinations undertaken for diagnosis or treatment of the examined person, this omission constitutes an implicit acknowledgement by the Legislature that these medical services were not intended to be immunized from suit as discretionary acts: "Section 855.6 implicitly suggests that the provision of professional health services, including the making of decisions regarding what constitutes an adequate examination for a particular purpose, does not constitute an act resulting from the exercise of discretion within the meaning of section 820.2; otherwise, the additional immunity set forth in section 855.6 would have been unnecessary. Furthermore, the exception in section 855.6 for examinations conducted for the purpose of treatment indicates a legislative intent not to eliminate the preexisting liability to patients seeking diagnosis and treatment by publicly employed health professionals. [Citations.]" (*Barner, supra,* 24 Cal.4th 676, 687.) Thus, in cases involving public health employees and public defenders, although both exercise judgmental decisionmaking from among complex alternatives calling upon high levels of skill, these acts are not "sensitive policy decision[s] that require[] judicial abstention to avoid affecting a coordinate governmental entity's decision-making or planning process . . . ." (*Id.* at p. 688.)

---

[13]Section 855.6 states in relevant part: "Except for an examination or diagnosis for the purpose of treatment, neither a public entity nor a public employee . . . is liable for injury caused by the failure . . . to make an adequate physical or mental examination . . . for the purpose of determining whether [a] person has a . . . condition that would constitute a hazard to the health or safety of himself or others."

Applying *Barner*'s tenets to the case before us, we are compelled to conclude that CCSF does not enjoy immunity from suit under Government Code section 820.2 for the manner in which its employees implement its EMS program. While decisions as to the service's content, breadth, and protocols may indeed have been made at a sufficiently high level as to cloak them with immunity, appellants assiduously avoid any challenge to these planning or policy-based choices. Instead, appellants have confined their charging allegations to those relating to the manner in which CCSF executed its extant program on the evening of August 27, 1998.

Having so limited their claims, we can divine no basis to distinguish legitimately the challenged conduct of CCSF's 911 dispatchers from other government health care providers who are not afforded immunity under Government Code section 820.2. (*Muskopf v. Corning Hospital Dist.* (1961) 55 Cal.2d 211, 220-221 [11 Cal.Rptr. 89, 359 P.2d 457] [no immunity for negligent treatment of a public hospital patient]; *Bohrer v. County of San Diego* (1980) 104 Cal.App.3d 155, 161-162 [163 Cal.Rptr. 419] [no discretionary immunity for negligently prescribing medication by health care provider at county clinic].) As pointed out by the *Barner* court, the Law Revision Commission's comments concerning Government Code section 855.6 are similarly instructive: " '[The immunity] does not apply to examinations for the purpose of treatment such as are made in doctors' offices and public hospitals. In those situations, the ordinary rules of liability would apply.' [Citations.]" (*Barner, supra,* 24 Cal.4th at pp. 687-688.)[14]

Nevertheless, CCSF seeks solace for its view within *Sullivan v. City of Sacramento, supra,* 190 Cal.App.3d 1070, a pre-*Barner* case involving alleged misconduct by a police dispatcher. But that case is factually distinguishable. In *Sullivan,* the misconduct involved the dispatcher's decision to place a call to the plaintiff in response to neighbor complaints during which the dispatcher berated and badgered the plaintiff while her assailant stood by armed with a hammer. (*Id.* at p. 1074.) In concluding that the discretionary immunity of Government Code section 820.2 applied to the decision to make the call, the court noted that "the choice whether or not to call was a

---

[14]The Supreme Court rejected an appeal for immunity based on the contention that without it public defenders might be unfairly saddled with civil liability thereby inhibiting their decisionmaking processes. Citing *Caldwell v. Montoya* (1995) 10 Cal.4th 972 [42 Cal.Rptr.2d 842, 897 P.2d 1320], the court in *Barner* emphasized: " '[F]ears that personal exposure to damage suits and judgments would deter the vigorous performance of public responsibilities are no longer a policy basis for immunity. . . .' " (*Barner, supra,* 24 Cal.4th at p. 691.) The court also pointed out that the Legislature had twice refused to grant public defenders statutory immunity. (*Id.* at p. 691, fn. 6.) We have made a similar observation concerning our Legislature's reticence to afford 911 dispatchers statutory immunity, and we rejected a similar argument concerning the fear of litigation involving individual public employees interposed by CCSF under our duty analysis. (See pp. 508-509, *ante.*)

discretionary decision invoking the ' "personal deliberation, decision and judgment" ' [citation] of the dispatcher . . . ." (*Sullivan*, at p. 1081.) Here, of course, no such decision is in issue. Instead, the alleged misconduct involves the manner in which a 911 emergency dispatcher responded to a citizen call for medical help. For this reason alone, even accepting the distinction made by *Sullivan*, we find it inapplicable to provide immunity in the factual context of this case.

## IV.

### DISPOSITION

The judgment below in favor of CCSF is reversed. The case is remanded to the trial court for further proceedings. Costs on appeal are awarded to appellants.

Kline, P. J., and Lambden, J., concurred.

A petition for a rehearing was denied February 11, 2002, and respondent's petition for review by the Supreme Court was denied May 15, 2002. Werdegar, J., did not participate therein. Chin, J., and Brown, J., were of the opinion that the petition should be granted.